**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY M. JOYCE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-334 |
| | ) | |
| v. | ) | Chief Magistrate Judge Lenihan |
| | ) | |
| CITY OF PITTSBURGH, CITY OF | ) | |
| PITTSBURGH POLICE OFFICER | ) | |
| KENNETH SIMON, AND CITY OF | ) | ECF Nos. 51, 54, 57 |
| PITTSBURGH POLICE OFFICER | ) | |
| ANTHONY SCARPINE, individually | ) | |
| And in their official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Presently before the Court are the Motions for Summary Judgment filed by Defendants Anthony Scarpine (ECF No. 51), Kenneth Simon (ECF No. 54), and the City of Pittsburgh (ECF No. 57). For the reasons that follow, the Motions will be granted as to the claim of excessive force and denied in all other respects.

Plaintiff Timothy M. Joyce filed this civil rights action against the individual Defendants in their individual and official capacities pursuant to 42 U.S.C. § 1983 alleging violations of his Fourth Amendments rights against excessive force, unlawful search and seizure, unlawful arrest and malicious prosecution. Plaintiff also brings state law claims against the individual Defendants for false imprisonment and malicious prosecution. Finally, Plaintiff alleges claims in municipal liability against the City of Pittsburgh pursuant to § 1983 claiming failure to supervise/train and discipline.

FACTS

The following facts are taken from the parties' Statements of Material Facts and Responses thereto at ECF Nos. 53, 56, 58, 61, 62, 63, 65, 68, 77, 80, 81, and 84. The facts are undisputed unless otherwise indicated.

This action arises from a series of events that occurred on or about July 7, 2010 at 8:30 p.m. (ECF Nos. 58, 61 at ¶ 29.) At that time, Plaintiff Timothy M. Joyce ("Plaintiff" or "Joyce") and David Carpenter ("Carpenter") were patrons of a self-serve carwash, located on Stayton Avenue in the North Side neighborhood of the City of Pittsburgh. (ECF Nos. 58, 61 at ¶ 30.) Plaintiff contends that he and Carpenter did not know each other and had arrived separately to the carwash. (ECF No. 61 at ¶ 30.) Upon Joyce's arrival at the car wash at approximately 8:00 p.m., he began to vacuum his vehicle. (ECF Nos. 58, 61 at ¶ 31.) Joyce had his sixteen-month-old daughter in the vehicle at the time. (ECF Nos. 53, 62 at ¶ 1.) Shortly thereafter, at approximately 8:20 p.m., Carpenter arrived at the car wash, went to a change machine, and then began to wash his vehicle. (ECF Nos. 58, 61 at ¶ 32.)

At or about the time Carpenter began washing his car, Defendant Officers Kenneth Simon ("Officer Simon") and Anthony Scarpine ("Officer Scarpine") (collectively "individual Defendants") were traveling southbound on Stayton Street. (ECF Nos. 58, 61 at ¶ 33.) According to the individual Defendants, they thought they saw some addicts in a vehicle traveling in the opposite lane. (ECF Nos. 53, 56 at ¶ 3.) Therefore, Officer Scarpine pulled into the car wash to turn around to follow the vehicle. (ECF Nos. 53, 56 at ¶ 3.) As Officer Scarpine was pulling into the car wash, Officer Simon believed he saw a hand-to-hand drug transaction between Carpenter and Joyce; Officer Simon told Officer Scarpine to "stop the car. They just did a deal." (ECF Nos. 53, 56 at ¶ 4.) Officer Simon testified that he viewed the transaction

diagonally through the police vehicle window.  (ECF Nos. 68, 76 at ¶ 40.)  Officer Scarpine

pulled into the car wash and Officer Simon exited the police vehicle and approached Joyce.

Officer Scarpine then drove the cruiser over to the bay where Carpenter was standing and exited

the cruiser.  (ECF Nos. 56, 63 at ¶ 5.)

      According to Carpenter and Joyce, although Officer Simon testified that he believed that

he saw a hand-to-hand drug transaction, no drug transaction took place between Joyce and

Carpenter; Joyce and Carpenter did not know each other, and never came into close proximity to

one another.  (ECF Nos. 68, 81 at ¶ 36.)  Carpenter and Joyce rely on video surveillance footage

recorded by cameras mounted to the exterior of the car wash.  (ECF Nos. 68, 81 at ¶ 38.)  A total

of four video cameras covered the front of the car wash.  (ECF Nos. 68, 81 at ¶ 38.)  The

surveillance footage fails to support Officer Simon's claim that he witnessed a hand-to-hand

drug transaction between Carpenter and Joyce.  (ECF Nos. 58, 61 at ¶ 38.)

      Defendant Officers Scarpine and Simon arrested and charged Carpenter and Joyce.  The

individual Defendants reported that they recovered cocaine, $217, and two cellular phones from

Carpenter; they also reported that they recovered heroin, $793, a cellular phone, and a SAP glove

from Joyce.  (ECF Nos. 58, 61 at ¶ 35.)  Joyce was charged with two counts of possession of a

controlled substance, three counts of possession with the intent to deliver and other charges.

(ECF No. 55-6 at 1-2.)

      After reviewing the surveillance video footage, Commander Rashall Brackney alerted the

Command Staff at City of Pittsburgh Police Headquarters, and brought this matter to the

attention of the Allegheny County District Attorney's Office for investigation.  The District

Attorney dropped the criminal charges against Carpenter and Joyce.  (ECF Nos. 58, 61 at ¶¶ 39-

40.)  Officer Scarpine was transferred and disciplined, and Officer Simon subsequently retired. (ECF Nos. 58, 61 at ¶ 41.)

On November 12, 2010 the District Attorney filed criminal charges against Officers Simon and Scarpine.  Defendant Simon was charged with two counts of perjury, two counts of false swearing, two counts of unsworn falsification to authorities and other charges.  Defendant Scarpine was charged with unsworn falsification, obstruction of administration of law, official oppression and criminal conspiracy.  (ECF No. 56, 63 at ¶ 10.)  After preliminary hearings, all charges against Officer Scarpine were dismissed.  (ECF Nos. 58, 61 at ¶¶ 42-43.)  Defendant Simon was acquitted of the charges against him at his jury trial.  (ECF No. 56, 63 at ¶ 10.)


LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof.  *Id.*  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.

*Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R.

Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence

is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v.

Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court

noted the following:

> [A]t the summary judgment stage the judge's function is not
> himself to weigh the evidence and determine the truth of the matter
> but to determine whether there is a genuine issue for trial. . . .
> [T]here is no issue for trial unless there is sufficient evidence
> favoring the nonmoving party for a jury to return a verdict for that
> party. If the evidence is merely colorable, or is not significantly
> probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).


ANALYSIS

**A. SECTION 1983 CLAIMS AGAINST INDIVIDUAL DEFENDANTS SIMON AND SCARPINE**

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or any other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate

that the conduct in the complaint was committed by a person or entity acting under color of state

law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the

Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36

F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

Here, Plaintiff's § 1983 claims are all premised upon the protections of the Fourth Amendment to the United States Constitution. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV. The Fourth Amendment has been made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

1. Excessive Force

In order to make out a claim for excessive force as an unreasonable seizure under the Fourth Amendment, Plaintiff must show that a seizure occurred and that it was unreasonable. *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999). Here, the parties do not dispute that there was a seizure of Plaintiff. Consequently, the only issue before this Court on Defendants' Motions for Summary Judgment is whether the force used to effect the seizure was objectively reasonable. In *Sharrar v. Felsing*, the United States Court of Appeals for the Third Circuit stated that whether the use of force is objectively reasonable is determined by analyzing several factors, including the following:

> [T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight[,] . . . [whether] the physical force applied was of such an

> extent as to lead to injury[,][1] . . . the possibility that the persons
> subject to the police action are themselves violent or dangerous,
> the duration of the action, whether the action takes place in the
> context of effecting an arrest, the possibility that the suspect may
> be armed, and the number of persons with whom the police
> officers must contend at one time.

128 F.3d 810, 821-22 (3d Cir. 1997) (internal citations and quotations omitted). In addition, the United States Supreme Court has emphasized that each case alleging excessive force must be evaluated under the totality of circumstances. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989)[2].

Here, Plaintiff has failed to come forward with any evidence that the individual Defendants used excessive force when arresting the Plaintiff. In his opposition brief at ECF No. 67 at 23-24, Plaintiff notes only that after the arrest, he was choked by an Officer Blahut, who is not a named defendant. Accordingly, the Court will grant the individual Defendants' Motion for Summary Judgment on Plaintiff's Fourth Amendment claim for excessive force.

## 2. False Arrest, Unreasonable Search and Seizure, Malicious Prosecution

"A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement." *Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000). As noted above, the parties do not dispute that Plaintiff was seized for purposes of the Fourth Amendment.

---

1 The *Sharrar* Court specifically stated that it did not agree "that the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality." 128 F.3d 810, 822 (3d Cir. 1997) (citations omitted).

2 In *Graham*, the Supreme Court cautioned that in applying the objective reasonableness test, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," will be deemed unreasonable. Instead, "[t]he calculus of reasonableness must embody allowance for the fact that 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" 409 U.S. at 396-97 (internal quotations omitted).

The Fourth Amendment's prohibition against unreasonable seizures protects individuals from arrest without probable cause. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972)). "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The law of the state where the arrest occurred controls whether the arrest is valid. *Myers*, 308 F.3d at 255 (citing *Ker v. California*, 374 U.S. 23, 37 (1963)). In determining whether probable cause exists to support an arrest, the analysis must be based upon the totality of circumstances including "the objective facts available to the officers at the time of the arrest." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (citing *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). Subjective intentions of police officers are irrelevant to a Fourth Amendment probable cause analysis. *Wren v. United States*, 517 U.S. 806, 813 (1996).

In order to make out a claim for malicious prosecution, a plaintiff must show the following:

> (1) the criminal proceeding was initiated by the defendant; (2) the criminal proceeding terminated favorably for the plaintiff; (3) the proceeding was initiated without probable cause; (4) the defendant's act of initiating the proceeding was malicious or not for the purpose of bringing the plaintiff to justice; and (5) the plaintiff was subject to an unconstitutional seizure as a consequence of the legal proceeding.

*Turosik v. Hougue*, Civil Case No. 08-1248, 2011 WL 1044648, at *7 (W.D. Pa. March 18, 2011) (citing *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)).

The individual Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's false arrest, unreasonable search and seizure, and malicious prosecution claims because probable cause, an element common to all of these claims, existed for Plaintiff's arrest. The individual Defendants state that they had reasonable suspicion to conduct a *Terry* stop[3] and perform a pat down of Joyce when Officer Simon observed what he believed to be a hand-to-hand drug transaction as Officer Scarpine pulled into the car wash. They contend that this reasonable suspicion escalated to probable cause when Officer Simon patted down Plaintiff Joyce, felt a bundle in his pocket, searched him, and found nine packets of heroin and cash. (ECF No. 55 at 8-9.)

Plaintiff responds that if Officer Simon believed he observed a hand-to-hand drug transaction, then Officer Simon would have had probable cause for arrest; no *Terry* considerations would have come into play because Officer Simon would have witnessed a crime. (ECF No. 67 at 24-25.) Second, Plaintiff responds that the video recovered from the car wash clearly shows that no hand-to-hand drug transaction occurred, that Carpenter and Joyce were never in close proximity to one another, and that Joyce had his back to Carpenter the entire time that Carpenter was at the change machine.

On summary judgment, this Court must not weigh the evidence. *Anderson*, 477 U.S. at 249-50. Instead, it must view the facts and draw reasonable inferences in a light most favorable to the party opposing the motion. Here, the individual moving Defendants contend that Officer Simon believed he saw a hand-to-hand drug transaction. Viewing the commission of a crime

---

3 "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot[,]" he may make reasonable inquiries. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). "[A]n investigative detention must be temporary and last no longer that is necessary to effectuate the purpose of the stop . . . ." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Where an officer fears for his safety or the safety of others during a *Terry* stop, a search incident to a *Terry* stop is limited to a search "of the outer clothing of such persons in an attempt to discover weapons which might be used to assault [the officer or others]." *Terry*, 392 U.S. at 30. *See also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *United States v. Yamba*, 506 F.3d 251, 259-60 (3d Cir. 2007).

supports the existence of probable cause for arrest.[4] *See Myers*, 308 F.3d at 255.  Plaintiff, however, has come forward with the videotape capturing the events in question.  The videotape clearly and unequivocally contradicts Officer Simon's version of events that a hand-to-hand drug transaction occurred.  These facts are material and must be viewed in favor of the nonmoving Plaintiff.[5]  Further, the videotape contradicts Officer Scarpine's contention that he saw Carpenter put something white in his pocket; the only item in Carpenter's hand as recorded on the videotape, is the car wash wand.  Instead, it confirms that Joyce had his back to Carpenter the entire time that Carpenter was at the change machine.

Defendant Officer Scarpine contends that he is entitled to judgment as a matter of law because he simply relied on what Officer Simon told him.  When Officer Scarpine reacted to Officer Simon's statement, if in fact Simon made the statement, and immediately looked to the car wash bays where Joyce and Carpenter were located, the videotape raises a genuine issue of fact as to whether Scarpine relied on the statement of Officer Simon in light of what Scarpine observed.  More importantly, because there is a genuine issue of fact as to whether Simon saw anything resembling a drug transaction and whether he so stated to Defendant Scarpine, there is a genuine issue of fact as to whether Scarpine relied on Simon at all.

The Court must deny summary judgment on this record.  It is for the trier of fact, not this Court on summary judgment, to evaluate the credibility of the individual Defendants in light of the videotape capturing the facts and circumstances surrounding the arrest of Carpenter and

---

4 It is important to note that Officer Simon did not qualify the statement he made to Scarpine: "Stop the car. He just did a deal."  Instead, Simon unequivocally stated that he saw Joyce and Carpenter do a drug deal, not that he thought they did, or that it appeared that they did.  Hence, there would be no need for an investigatory stop and subsequent *Terry* pat down because probable cause would exist where an officer witnesses a crime.  That is, witnessing a crime would lead a person of reasonable caution to conclude that the offense was committed by the persons arrested.  *See Myers*, 308 F.3d at 255.  *See also Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 (3d Cir. 2000) (a credible report from a person who witnessed a crime is sufficient to establish probable cause).

5 Even if the events in issue constituted a *Terry* stop, the video raises an issue of material fact as to whether Defendants had reasonable suspicion to conduct an investigative detention of Carpenter and Joyce.

Joyce. A reasonable jury could find that based upon the videotape, the individual Defendants violated Plaintiff's Fourth Amendment rights. Hence, the individual Defendants' Motions for Summary Judgment on Plaintiff's claims for false arrest, unreasonable search and seizure, and malicious prosecution will be denied.

### 3. Fourteenth Amendment Substantive Due Process

Defendants misinterpret Plaintiff's Fourth Amendment claims as claims premised on the substantive due process protections of the Fourteenth Amendment. The law is clear that when government conduct is governed by a specific constitutional amendment, that amendment should be applied rather that the more general guarantee of substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998). *See also Graham v. Connor,* 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force -deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.") Clearly, the more specific protections of the Fourth Amendment apply here. Hence, as conceded by Plaintiff (ECF No. 67 at 28-29, 31), there is no Fourteenth Amendment substantive due process claim for which Defendants may seek judgment as a matter of law.

### 4. Qualified Immunity

The individual Defendants argue that even if they did not have probable cause to arrest, they are entitled to qualified immunity because it was reasonable for Officer Simon to believe he saw a drug transaction from his point of view in an area known for drug activity. Further,

Officer Scarpine contends that it was reasonable for him to rely on the observations of his partner, Officer Simon.

Plaintiff responds that the individual Defendants did violate Plaintiff's Fourth Amendment rights and that Officer Simon, in light of the video, was not reasonable in his reaction to what he actually viewed. Further, Plaintiff notes that Officer Scarpine's reliance on what Officer Simon told him was not reasonable in light of Officer Scarpine's own observations that when he immediately looked up after being alerted to the alleged drug transaction, he did not see Carpenter and Joyce in close proximity to one another, or notice one of them moving quickly away from the other. (ECF No. 67 at 33-34.)

State officials performing discretionary acts enjoy "qualified immunity" from money damages in § 1983 causes of action when their conduct does not violate "clearly established" statutory or constitutional rights of which a "reasonable person" would have known at the time the incident occurred. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The first inquiry under a qualified immunity analysis is whether the plaintiff has established a violation of a "clearly established constitutional right" as follows:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).

The second inquiry concerns the reasonableness of the defendant's actions. The test for qualified immunity is based on objective reasonableness, that is, "whether a reasonable officer could have believed [the challenged action] to be lawful, in light of clearly established law and

the information the [ ] officers possessed." *Giuffre v. Bissell*, 31 F.3d 1241, 1255 (3d Cir. 1994) (quoting *Anderson,* 483 U.S. at 641). "The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officers in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." *Giuffre*, 31 F.3d at 1255 (internal quotation omitted). It is the defendant's burden to establish that they are entitled to qualified immunity. *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989).

In *Saucier v. Katz,* 533 U.S. 194 (2001), the United States Supreme Court clarified the two-step qualified immunity inquiry. The Court directed that, in deciding whether a defendant is protected by qualified immunity, a court first must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id*. at 201. If the facts do not establish the violation of a constitutional right, no further inquiry concerning qualified immunity is necessary. *Id*. If the plaintiff's factual allegations do show a violation of his rights, then the court must proceed to determine whether the right was "clearly established," that is, whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. *Id*. at 201-02. Finally, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the United States Supreme Court concluded that while the two-step sequence identified in *Saucier* "is often appropriate, it should no longer be regarded as mandatory." *Id*. at 236.

Here, taken in the light most favorable to the party asserting the injury, the facts show the individual Defendant Officers' conduct violated Plaintiff's Fourth Amendment rights. *See Saucier,* 533 U.S. at 201. Plaintiff has come forward with evidence in the form of the car wash

surveillance videotape that captures the seizure, search, and arrest of Plaintiff. The video does not support Officer Simon's version of events; it does not reflect "reasonably trustworthy information or circumstances . . . sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *Myers*, 308 F.3d at 255. Further, Fourth Amendment jurisprudence relating to probable cause was delineated with sufficient clarity to make a reasonable officer in the individual Defendants' circumstances aware that what they were doing violated the right. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995); *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

The individual Defendant Officers contend that they reasonably believed that their conduct was lawful in light of the information that they possessed at the time. Plaintiff has come forward with evidence, however, that captures the facts and circumstances that would have been visible to the officers when they turned into the car wash. There have been no allegations in this case that this evidence, the car wash video, was doctored or altered in any way, or that what it depicts differs from what actually happened. It quite clearly contradicts the individual Defendants' version of events. Hence, Plaintiff has raised a genuine issue of fact as to whether the individual Defendants actually possessed the information that supported their belief that their conduct was lawful. These disputed facts are material to the Court's qualified immunity analysis. Specifically, as to Defendant Simon, these disputed issues of fact include 1) whether he saw anything resembling a hand-to-hand drug transaction in light of what he observed when he pulled into the car wash; and 2) whether he actually stated to Scarpine that he saw a drug transaction. Relatedly, as to Defendant Scarpine, these disputed issues of fact include whether he relied on the statement by Defendant Simon, if Simon in fact made the statement, in light of

what Scarpine observed immediately after Simon alerted him to the alleged transaction.

Therefore, the Court must deny the individual Defendants' claim of qualified immunity.

B. **SECTION 1983 MUNICIPAL LIABILITY CLAIMS AGAINST DEFENDANT CITY OF PITTSBURGH**

In *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. In so ruling, however, the Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, that is, through application of the doctrine of respondeat superior. Instead, the Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. *Id*.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. *Id*. at 690-91. A municipal policy is made when a decision-maker issues an official proclamation or decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *quoted in*, *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice, however, may consist of a course of conduct so permanent and widespread that it has the force of law. *Andrews*, 895 F.2d at 1480. To establish municipal liability based upon a custom or practice, the plaintiff must demonstrate that the decision-maker had notice that a constitutional violation could occur and that the decision-maker acted with deliberate indifference to this risk. *Berg v. Cnty. of*

*Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Finally, Plaintiff must show a causal connection between the custom or policy and the violation of the constitutional right. *Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir. 1990). That is, a plaintiff must demonstrate an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional deprivation. *Bielevicz*, 915 F.2d at 850-51. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id*. at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190-91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982)).

Defendant City of Pittsburgh ("the City") argues that it is entitled to judgment as a matter of law for the following reasons: 1) Plaintiff is unable to demonstrate that any of the City's policies and procedures caused Plaintiff's injuries; and 2) Plaintiff has not demonstrated how it failed to train, supervise or discipline the individual Defendant Officers.

In his Second Amended Complaint, Plaintiff alleges several municipal liability theories. The record here, however, implicates the theory of failure to supervise/train, including the failure to discipline.

The United States Court of Appeals for the Third Circuit set forth the standard for imposing liability against a supervisor under § 1983 in *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). Relying on the precepts set forth by the United States Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1989), the *Sample* court noted that "a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person'−whether a natural one or a municipality−has exhibited deliberate indifference to the plight of the person deprived." *Sample*, 885 F.2d at 1118 (internal citation omitted). The Court continued that in order to establish supervisory liability, the plaintiff must identify a specific supervisory practice or

procedure that the defendant failed to employ, that the existing custom or practice without that specific practice or procedure created an unreasonable risk of harm, that defendant was aware that this unreasonable risk existed, that defendant was indifferent to that risk, and that plaintiff's harm resulted from defendant's failure to employ that supervisory practice or procedure. 885 F.2d at 1118.

As noted by the *Sample* court:

> Normally, an unreasonable risk in a supervisory liability case will be shown by evidence that such *harm* has in fact occurred on numerous occasions. Similarly, deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond appropriately in the face of an awareness of a *pattern of such injuries*.

*Id.* (emphasis added). Plaintiff has come forward with no evidence to show a pattern of injuries similar to Plaintiff's alleged Fourth Amendment violations. Further, Plaintiff has come forward with no evidence to show that the supervisory hierarchy of the City was aware of similar incidents.

*City of* Canton, however, instructs that the absence of prior incidents in the record and knowledge thereof is not necessarily fatal to Plaintiff's case. *Sample*, 885 F.2d at 1118 (discussing *City of Canton*). That is, where a pattern of constitutionally cognizable injury is not presented by the record, a plaintiff may still prove § 1983 liability pursuant to a supervisory theory. Specifically, there may be cases where "the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." *Id.*

As to causation, the *Sample* court concluded as follows:

> [U]nder the teachings of *City of Canton* it is not enough for a
> plaintiff to argue that the constitutionally cognizable injury would
> not have occurred if the superior had done more than he or she did.
> The district court must insist that [plaintiff] identify specifically
> what it is that [defendant] failed to do that evidences his deliberate
> indifference. Only in the context of a specific defalcation on the
> part of the supervisory official can the court assess whether the
> official's conduct evidenced deliberate indifference and whether
> there is a close causal relationship between the "identified
> deficiency" and the "ultimate injury."

*Sample*, 885 F.2d at 1118.

Here, Plaintiff has come forward with detailed evidence of the disciplinary histories of

Officers Simon and Scarpine. As to Officer Simon, Plaintiff has come forward with evidence of

five disciplinary actions that began in 2003, and ending in 2009. All of them involved some

aspect of untruthfulness by Officer Simon. Even after his fifth reprimand involving

untruthfulness in some form, Officer Simon was not terminated. More importantly, as a

recommended discipline moved up the chain of command for approval, disapproval or

amendment from the Zone Commander, Assistant Chief, Deputy Chief, Chief of Police, and

finally to the Director of Public Safety, Officer Simon's disciplines were often downgraded.

Further, Officer Simon was not given additional training or retraining on the necessity of

truthfulness in the realm of police work, even after repeated infractions involving untruthfulness.

As to Defendant Scarpine, Plaintiff has come forward with similar evidence. Officers

Scarpine's first disciplinary infraction involving some aspect of untruthfulness occurred in 2002,

with the last occurring in May and December 2010. For both the 2002 and 2010 disciplines,

Officer Scarpine's disciplines were downgraded.

Based on the disciplinary histories of both Officers, a reasonable trier of fact could

conclude that it would have been obvious to the City's hierarchy of supervisors that police

officers like the individual Defendants would continue to engage in similar acts of untruthfulness

leading to constitutionally cognizable injuries to the public.  The downgraded disciplines were inadequate and provided little deterrence as evidenced by the series of disciplinary infractions by Officers Simon and Scarpine, including the following:

1. After two disciplinary infractions for untruthfulness in 2003 and 2006, Officers Simon's 2007 infraction concerned his suggestion to remove certain facts and charges from his investigative report to cover for his own neglect regarding certain police procedures. Simon's supervisor testified that Simon's conduct could destroy public respect for police and diminish confidence in the Bureau.  Yet, the recommended discipline by the Zone Commander of a five day suspension and termination was downgraded by the Director of Public Safety to a one day suspension.

2. An August 2007 disciplinary proceeding concerned Officer Simon's direct violation of a supervisor's orders and procedures.  Particularly important here is a memorandum authored by Lieutenant Ragland to Chief Harper wherein Ragland stated the following: "Officer Simon has a **proven track record for being untruthful**. . . . In fact, given what has occurred coupled with Officer Simon's disciplinary history, I have extreme difficulty in trusting anything that Officer Simon tells me or anything that is stated in his reports without a supervisor or another officer present."  Ragland further stated that "Officer Simon's conduct has eroded my confidence in him to perform as a police officer."  He continues that "Simon attempts to spin a scenario to [] individuals to influence their recollection of events that puts his actions in the best light.  At best, these attempts at persuasion are improper and at worst, come close to harassment and intimidation."  Finally, Ragland concludes that Simon "is a manipulator and has consistently meddled in his own investigation in an attempt to shift blame from himself onto others."  Both the

Assistant Chief and Deputy Chief signed the memorandum. (ECF No. 72-6 at 2-4 (emphasis in original).) Yet, Officer Simon's initial five day suspension pending termination was downgraded to a three day suspension. Officer Simon was not terminated for this fourth disciplinary infraction involving untruthfulness.

3. Two years later in December 2009, Officer Simon was untruthful in preparing a memorandum of an incident where he disobeyed a direct order of a supervisor. Again, his discipline was downgraded and he was not terminated.

4. On December 3, 2010, Officer Scarpine was the subject of a fourth disciplinary action for a violation that occurred on May 6, 2010. This disciplinary action was Officer Scarpine's second relating to untruthfulness. On May 6, Officer Scarpine arrested an individual whom Scarpine allegedly saw assault and threaten another. Surveillance video did not support Scarpine's version of events. He was charged with conduct unbecoming an officer, untruthfulness, and a records/reports violation. Similarly, Scarpine's discipline was downgraded from a five day suspension pending termination to a 10 day suspension.

Clearly, these disciplinary histories demonstrate a great and obvious risk that Officers Simon and Scarpine would participate in conduct involving untruthfulness, especially as it concerned the public in the preparation of police documents, and the accurate reporting of facts and circumstances on the job. Where police officers are manipulating police reports and investigations to serve their own purposes, an obvious risk of constitutional cognizable injury to the public exists, especially as it concerns the Fourth Amendment rights of those with whom the police come into contact. In addition, the supervisory hierarchy would have had knowledge of this risk in light of its participation in the disciplinary process at all levels. Finally, the practice of downgrading disciplines, and the failure of the City to train or retrain Officer Simon regarding

the importance of truthfulness in police work, or to terminate him after his repeated infractions for untruthfulness, seemingly reflects the City's deliberate indifference to the risk.

Finally, Plaintiff has come forward with sufficient evidence to demonstrate an "affirmative link" or "plausible nexus" between the City's failure to meaningfully supervise/train and discipline its officers on the importance of truthfulness in police work in their dealings with the public, and the alleged Fourth Amendment violations at issue here. Therefore, the question of whether the municipal policy or custom proximately caused the constitutional infringement should be left to the trier of fact.

Hence, the City's Motion for Summary Judgment must be denied.


CONCLUSION

For the reasons discussed above, Defendants' Motions for Summary Judgment will be granted as to the claim of excessive force and denied in all other respects.

An appropriate order follows.


Dated: March 31, 2014




s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
CHIEF UNITED STATES MAGISTRATE JUDGE


cc:     All counsel of record
        Via electronic filing